## MARIA HEWITT

*v.*

## JESSE LONG.

| 76 | 399 |
| 27a | 378 |
| 76 | 399 |
| 128 | 381 |
| 76 | 399 |
| 42a | 261 |
| 76 | 399 |
| 101a | 4190 |

1. CUSTODY OF CHILDREN—*good of child the primary object.* In disposing of the custody of children, the primary object should be the good of the children, and where the child has arrived at an age to choose for itself, the court will not take it from one parent and give it to another against its wishes.

2. SAME—*ground of father's superior right at common law.* The father's paramount right to the custody of his child by the common law, springs from his obligation to provide for its maintenance. Where he is fully discharged from that obligation by decree of court granting his wife a divorce, his common law right to the custody of his child must necessarily yield to the discretionary power over the subject vested by the statute in the court.

3. SAME—*effect of decree of divorce on question.* Where a divorce is granted to a wife for the misconduct of the husband, on a subsequent application to modify the decree giving the mother the custody of their child, the father will be conclusively estopped from alleging any facts inconsistent with those found in the decree of divorce.

4. Where the father wilfully deserted his wife before the birth of their daughter, without cause, went to another State, and when the child was fourteen years of age, sought to have the decree giving the child to her mother on divorce modified, and her custody given to him, so that he might take her out of the State among total strangers, and thus deprive the mother, the unoffending party, of her society, and it appeared that the child did not want to be taken from her mother, who was devotedly attached to her, and was shown to be an amiable and respectable person, and to have done her duty by the child, and was able to give her a good education and properly care for her, it was *held*, that a decree giving the child to the father thus situated, although wealthy, could not be sustained, and the same was reversed, and the petition of the father dismissed.

APPEAL from the Circuit Court of Cass county; the Hon. CHARLES TURNER, Judge, presiding.

The facts of the case are fully stated in the opinion of the court, and in the dissenting opinion of Mr. JUSTICE BREESE.

Messrs. DUMMER & BROWN, for the appellant.

Messrs. KETCHAM & GRIDLEY, for the appellee.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

This is a controversy between parents, about the custody of a female child, named Alice Long, born October 5, 1858. The parties to the suit were married in Cass county, this State, March 15, 1857, and from thence lived together as husband and wife in that county until the wife, appellant

here, became advanced in pregnancy with said child, when, and before her birth, Jesse Long, the husband, appellee here, wilfully and without any reasonable cause deserted and absented himself from appellant, and so continued to do for the space of more than two years, whereupon she filed her bill in the circuit court of Cass county, where she had, meanwhile, resided, for a dissolution of the marriage, on the ground of such desertion. Jurisdiction was obtained of the person of appellee by publication, and by his afterwards causing his appearance to be entered by an attorney in fact, and such proceedings were thereupon had in said cause that afterwards, at the September term, 1860, of said court a decree was duly entered therein in appellant's favor and against appellee, dissolving said marriage for the cause aforesaid, and awarding the care and custody of said child to appellant, the mother, also requiring appellee to pay appellant as alimony the sum of $1000, and to the guardian of said child the sum of $2000 for her support and maintenance. These sums, as appears by the decree, were respectively paid at the time of entering it.

At the January term, 1873, of said court, Long presented his application, by petition and notice, for a modification of said decree so as to take the custody of said child from the mother, and bestow it upon him. At the April term next following, the application was granted, and the mother appeals to this court.

We shall not undertake to set out in detail the evidence upon which this modification was made, but only the results of it, as gathered from a careful examination.

It appears that from Long's first desertion of his wife, he has continually absented himself from this State, with the exception of two visits, at which he barely saw Alice, and a third, when he came with two other men with a view to take her with him to Iowa, without the leave of the court, but could not find her. On this last occasion he did not see her at all. By his thus absenting himself from the State, he was
26—76TH ILL.

almost a total stranger to the child. It appears that at the time of the hearing, Alice was upwards of fourteen years of age, and she testified in court to her desire to stay with her mother, and her aversion to being taken away by her father, who was a stranger to her. As showing reasons for the modification, Long introduced the testimony of various business men and some public officers residing in Jasper county, in the State of Iowa, to the effect that Long was the owner of, and resided upon, a farm situate about six miles from the village of Newton, in that county, the farm comprising some 2000 acres of land, mostly under cultivation, with a good house and other improvements upon it; that he was a cattle raiser, drover, and active business man; that he had a large amount of personal property, and his whole property was variously estimated at a value ranging from $50,000 to $150,000; that he was president of a national bank in Newton, had established a church and a school on his farm. It was shown that in 1867 he married the wife with whom he then lived, but had no children by her; that his house was well furnished, having both a piano and organ in it, upon which his wife played, and that she was a teacher in a Sabbath school. There is no evidence as to the age or experience of this wife, and none in respect to her, coming from any one having more than a general, casual acquaintance with her—none as to who she was, where she was brought up, what was her character before her marriage, or as to any of her personal characteristics. All that can be determined about her from the evidence, is barely that she is a woman who attends church, teaches in a Sabbath school, and plays upon a piano and organ. It is virtually into the society, keeping and control of this unknown woman, a total stranger to this young girl, that the latter is to be forcibly cast by the order appealed from. It is unnecessary to say, that a woman may attend church, may teach in a Sabbath school, and play both piano and organ, and yet be wholly unfit to be the mistress over a girl reared in tenderness and affection, as Alice

has been. The father can have no particular affection for this child. The theory of natural affection which tenderly clings to a child whom a parent has never scarcely seen, and upon whom he has bestowed no care, may do for works of the imagination, but will not, in the absence of proof, be presumed in a judicial investigation. There being much to repel, and nothing to warrant, the inference of affection on his part, when we consider his heartless treatment of the mother, his voluntary desertion of the child itself until nearly fourteen years of age, are we not justified in suspecting his motives? May they not be, after all, to annoy the mother, whom he must feel conscious of having injured, or may they not be to place the child in the position of mere drudge to this second wife. of whose personal characteristics we know so little? Is Long shown to be such a man as to whom no such motives should be imputed? If he possesses any degree of natural affection, why has he not exhibited it towards this child in earlier years? Without reasonable cause he deliberately deserted the child's mother when she was about to become such, and that mother never received from him one word of explanation, either by letter or message, has never even seen his face from the time of that act until she met him in court, more than fourteen years afterwards, to resist his efforts to tear this child from her very bosom, to forcibly bear away the girl to a foreign State, among strangers, where she may be immured in that country castle, a virtual prisoner, under the dominion of such a father, beyond the ear of the court of which she is ward, beyond the reach of its protecting hand, and beyond a mother's watchful eye, while we have no assurance of a counteracting influence from the second wife. Can a chancellor, under these circumstances, say, upon his conscience, it is just, it is in accordance with humane, equitable principles, to place this child's welfare, physical and moral, in such jeopardy?

But his counsel say he may have had reasonable cause for leaving this child's mother as he did, but he is too manly to

disclose it.   No speculations of this nature can be indulged. Appellee can not make an issue upon that question.   The statute makes wilful desertion, without reasonable cause, for the space of two years, a ground for divorce.   Upon that ground the bill in the original cause was filed.   The decree finds all the necessary facts, and dissolves the marriage.   By this decree he is conclusively estopped from alleging in this proceeding that he had reasonable cause for the desertion.

Again, the witnesses from Jasper county seem none of them to have known him there more than five or six years.   Prunty, who was his attorney in fact in the divorce case, says he has known him twenty-five years.   There is no witness, not even Long himself, who pretends to testify as to what means he had at the time he deserted appellant, or where, for the eight years preceding his being known in Jasper county, he had been, what he had been doing, or how he acquired his vast property, which he says amounted to from $150,000 to $200,-000.   There was a presumption against him for his past acts, which it was for him to overcome by proof.   In short, it was for him to satisfy the conscience of the court that he was a different man from what he was when he committed the breach of his marital obligations.   How has he done this? By showing that somehow, during the late civil war, he acquired a large property; that he was president of a national bank?   His wealth would give him that position.   By showing he had established a church and school on his farm?   His property alone would do that, and the motive might be the gratification of personal vanity.   That he kept his contracts with his fellow-men?   Self-interest would dictate that.   We have given us, to repel the presumption against him that he could not be relied on in the relation of guardian having the custody of this child, literally nothing but the general evidence of business men and public officers of Jasper county, touching his mere outward circumstances and appearances, with the simple fact superadded that in his business transactions he was generally correct.   This is but the exhibit which

any man may make, no matter how faithless in his domestic relations, who had in early life married a virtuous and respectable girl; lived with her long enough to fully gratify his animal passions, and until she was about to become a mother, then, without reasonable cause, basely desert her; go west; acquire, no matter how, large wealth; marry a lady capable of making a display, by being a leader in the church and Sabbath school, of playing piano and organ; establish a church, a bank and a school, and gain that sort of influential position which wealth, especially in new communities, so readily leads to. If the question were, whether the circuit court of Cass county should permit the property of a ward of that court to be taken out of its jurisdiction and intrusted to the hands of Jesse Long, it would be different; yet, would there not be great hesitation, even then? But the question here is, whether that court shall abdicate its functions in respect to its ward, Alice Long, a girl of fourteen years, tenderly reared, and devotedly attached to her mother, and subject her to be forcibly, and against her will, wrested from the circle of her home and her love, carried beyond the jurisdiction of the court into a foreign State, there to be subjected to the dominion and control of a father who is a total stranger to her, and of whom all the court knows is, that he basely deserted that child's mother, but has since, and during the late civil war, become wealthy, and acquired the ostentatious position which mere wealth itself may bestow.

Usually, the question of custody of children arises between parents who have mutually contributed their aid and parental offices to rearing them, and where, from the circumstances, the degree of their affections is nearly the same; but here, the care and watchfulness are all from the mother; she has all the affection for this child which a kind mother can have, and it is next to impossible, from the circumstances, that Long should have any; and yet, she being the unoffending party, the only parent who can be supposed to have strong, tender affections for this child, is to be thus forcibly deprived

of her society, and not only that, but subjected to the severe and immitigable punishment of having the object of her love carried, against her will, into a foreign State, thus cutting her off from even the poor privilege of visiting her and learning of her welfare. What has she done to merit all this? Who is she, that her rights, the claims of a mother's affections, should be so disregarded—so despised?

It is quite impossible to read the evidence in this record without rising from its perusal with a thorough conviction of both reason and conscience that this mother is a most estimable woman. Her character and all the antecedents leading to its development, together with her precise relations to this child, are before us. When she gave birth to Alice, there was also born a twin brother. The terrible perils of this birth she encountered alone, without the aid. presence or sympathy of Jesse Long, her then husband and the father of those children. She not only encountered them alone, but with the stigma and mortification of his inexplicable desertion superadded; and thus alone, basely deserted by him who only a little over one year before had taken upon himself all the solemn obligations of marriage, she had to nurture and care for these helpless offspring of a faithless husband, when, after about a year, she consigned the little boy to the grave. Alice survived; and for five years, during all the worst dangers of infancy, this mother, taking refuge under her father's roof, gave that child her care and watchfulness, under circumstances well calculated to bind it closely to her heart. It needs not the words of witnesses to tell us that no object is likely to become more dear than a child nurtured in sorrow by a deserted mother. Through all these trials, and in every new relation, she has borne herself in such a manner as to secure the respect of her acquaintances and neighbors. If one stain upon her character could be found, Long, who had ignored his relationship to this child for fourteen years, and now comes, in the pride and panoply of his wealth, and the arrogance of the common law right of fatherhood,

to snatch it away, would have found and fixed that stain upon her. By what guide to the discretion and conscience of a chancellor can this thing be done? It is not pretended, by the evidence, or even in the argument of counsel, that this appellant is not a fit and proper person to have the continued custody of this girl, at an age when the moral and physical welfare of the latter, above all other times, needs the confidential advice of a mother. The evidence shows that after Alice was five years old, and appellant married Somers Hewitt, she was, at the earnest request of appellant's parents, then advanced in life, with no children at home, but in good circumstances, and between whom and Alice there was a mutual attachment, permitted by appellant to stay temporarily with her grandparents.

There was an ante-nuptial agreement between appellant and Somers Hewitt that Alice should have a home in her family, and be treated as a child. This agreement Hewitt has always been willing cheerfully to fulfil; but as the grandparents found so much comfort in the society of this child, she was permitted to remain with them until they died—the grandfather dying in November and the grandmother in December, 1872. During all this time, the relations between Alice and her mother were most intimate, and the latter had the actual superintendence of her course of life. She had received all the education which it was meet and proper for a child of her age to receive. She is dutiful, bright and vigorous, and her mother, having taken her home at the death of her grandparents, declares, as a witness, her purpose to bring her up with virtuous, industrious habits, and give her a good education; and to this end she needs none of appellee's money. Alice is worth $5000 in her own right. Appellant derives from her father's estate some $5000 or $6000 in her own right; and Somers Hewitt is a respectable, well-to-do farmer, owning some 200 acres of land, with a large, commodious house upon it, free of debt, with plenty of personal property, and is worth from $12,000 to $15,000. He is willing to give

the girl a home with her mother, and make up whatever is lacking to give her a suitable education.

Under all these circumstances, we are at a loss to understand what reason could have dictated the making the modification of the decree, unless it was the supposed paramount common law right of the father, as such. In disposing of the custody of children, the primary object should be the good of the children. Now, waiving all other questions, can it be successfully maintained that the good, the substantial welfare of Alice Long, will be promoted by thus forcing her away from her mother and all the associations of her childhood, and taking her into a foreign State, among total strangers, to pine, and, perhaps, die of a broken heart? Are her feelings and choice entitled to no consideration? Would not the impression that a great wrong had been committed upon her remain with her as long as life lasted?

"The proposition," says Bishop, "is generally regarded as true, that one who has conducted either well or ill in a particular domestic relation, will conduct the same in another; and so, as a general practice, the court gives the custody to the innocent party, because with such party the children will be more likely to be cared for properly." 2 Bish. on Mar. and Div. sec. 532. This rule, from the language employed, is subject to certain exceptions, which are not material to this case.

But counsel for appellee say, that "courts of equity will not only investigate the facts, but will also recognize the legal principle that the right of the father to the custody of a minor child is paramount to that of the mother."

Courts will recognize the principle whenever it is applicable. This right of the father springs from the obligation of the father, by the common law, to provide for the maintenance of his children. Kent says: "In consequence of the obligation of the father to provide for the maintenance, and, in some qualified degree, for the education of his infant children, he is entitled to the custody of their persons and

to the value of their labor and services." 2 Com. 193. No
such obligation rested upon Jesse Long. He was fully dis-
charged from it by the original decree; and, besides, how
could any such paramount right co-exist with the exercise of
the power conferred by the provisions of the sixth section of
the divorce act upon the court of chancery? "When a di-
vorce shall be decreed, it shall and may be lawful for the
court to make such order touching the alimony and mainten-
ance of the wife, the *care, custody and support* of the children,
or any of them, as, from the circumstances of the parties and
the nature of the case, shall be fit, reasonable and just."
Whenever a father becomes subject to the jurisdiction of the
court, in a proceeding for a divorce, his common law right
to the custody of infant children must necessarily yield to
the discretionary power over the subject, vested by the stat-
ute in the court. This point is expressly decided in the case
of *Miner* v. *Miner*, 11 Ill. 43. It was there held that, under
our statute, the paramount right of the father to the children
will not be recognized where a divorce has been granted for
his fault or misconduct. See, also, *Cowls* v. *Cowls*, 3 Gilm.
435.

In the former of these cases, the court said: "It is appar-
ent from the record that there is some intention on the part
of the mother, if allowed to retain the custody of the child, to
remove her beyond the limits of the State. This can not be
tolerated, and must be guarded against. While the child is
given to the mother, the father must not be wholly deprived
of its society, but must be allowed access to it upon all rea-
sonable occasions."

The principle or reason upon which this observation is
based does not appear any further than that, by such removal,
the father would practically be wholly deprived of the society
of the child. By the decree, Alice Long became the ward
of the court. The incidents of that wardship, by our law,
are: The ward must be protected from ill treatment; must
be educated under the court's superintendence, and her estate

must be managed and applied under the like superintendence. The mother here, by the delegation of the court's authority, was made the guardian of her person, though not of her estate. For that purpose another person was appointed. The fact of her having an estate derived through the decree, would enable the court to exercise its power of superintendence over her education. The guardian of the person of an infant, appointed under the inherent or statutory authority of the court, is, for that purpose, an officer of the court. Now, while we do not deny the power of the court to permit the ward, under special circumstances, to be taken temporarily out of its jurisdiction, still it seems to us that to remove a guardian who resides in the county of the court, and appoint one who does not, and is to continue to reside beyond the limits of the State, to whose domicil the ward is to be taken, and there permanently to remain, is for the court to divest itself of all practical power over the incidents of the wardship, and to virtually abdicate its functions in respect to those incidents. For what control can the court have over one, theoretically an officer of the court, but who resides permanently beyond the limits of the State? What protection can the court give to its ward thus permanently residing; what superintendence over her education; how manage and apply her estate?

But the question has still another aspect. Concede, for the sake of argument, that under certain special circumstances, the court may thus virtually abdicate its functions, the real question in this case is, whether, in doing so, the court may *compel* this ward, against her express opposition, to quit this State and submit to be taken, against her will, into another, to there permanently reside. She had arrived at years of discretion when the order appealed from was made. She was upwards of fourteen years of age. She was capable of judging for herself, and had the natural right of determining where she would go. Courts "will consult the inclination of the infant, if it be of a sufficiently mature age to judge for itself,

and even control the right of the father to the possession and education of the child, where the nature of the case appears to warrant it." 2 Kent's Com. 195. In *King* v. *Greenhill*, 4 Adolp. & Ellis, 624, LITTLEDALE, J., said: "Upon general principles of law, the father is entitled to the custody of the children. If they be of an age to judge for themselves, *they have a right to determine where they will go;* but if they be not, it is the bounden duty of the court to put them in that custody which the law points out." This was where the common law paramount right of the father was in force in all its severity.

Here, the question arises under a statutory authority which abrogates that right and requires the court to make such an order as, from the circumstances of the parties and the nature of the case, shall be fit, reasonable and just. Alice Long was born in this State, owes natural allegiance, and has certain independent personal rights. The laws and customs of this State are her birth-right. It is by those laws and the circumstances of her parents that she became a ward of the court, and, as such, entitled to its protection and superintendence over her welfare. By those laws, she will attain her majority and be entitled to the possession of her estate in the hands of her guardian, and to call him to account when she becomes eighteen years of age. Whereas, the common law is presumed to prevail in the State to which she is to be taken, and by it she will not be emancipated until she attains the age of twenty-one. It is the English rule, and one founded upon substantial grounds, that, although the court may, under special circumstances, allow an infant ward to go out of the jurisdiction, yet it will never *compel* his removal. *Dawson* v. *Jay*, 3 DeG. Mac. & G. 764.

In that case, the ward was eleven years of age, but was strongly opposed to being taken away. In the course of his opinion, the Lord Chancellor said: "I know of no instance in which this court, when exercising its jurisdiction in taking care of the subjects of this country, has ever so far abdicated

its functions as to send a ward away to some other jurisdiction. * * * I know of no instance in which it has been done; nay, more, I very much doubt whether any functionary in this country has authority to compel a subject of this country thus to expatriate himself, for that is the truth of what is proposed. * * * I am to deal with the child as the parent would, but subject to the qualification, that I have no right permanently to divest myself of the control over the child, which I should be doing if, in this instance, I were to send her out of the country."

The modification of the decree is clearly unjust toward the mother. As these parties stand before the court, the father is the guilty, the mother the unoffending, party. He has become a stranger to the child, deprived himself of her society by his own voluntary and very deliberate act. He, judging him by his conduct, must be quite destitute of affection for the child, while the mother is bound to her by the strongest ties. Now, if either of these parties must, in the future, be deprived of the society of the child, which, under these circumstances, ought it to be, the unoffending or the guilty party? The law has such regard for the affections of parents, where they are shown to possess any, that when a divorce is decreed, even the guilty party will not be wholly deprived of the society of the children, but provision will be made for such party to visit them at all reasonable times. It was to avoid the deprivation of this right, that this court, in *Miner* v. *Miner*, above cited, so emphatically forbade even the unoffending party taking the ward out of the State. But by the modification of the decree, the innocent parent is to be subject to this deprivation in favor of the guilty one. This would be manifestly unjust, and can not be tolerated. There is no ground shown for this extraordinary concession to a faithless husband, but that of a supposed blind idolatry for wealth, of which he has taken far greater pains to make an exhibition, than of any personal virtues. But how can his wealth affect the question? What has he proposed in that

behalf? He introduces Prunty as a witness, who gave it as his opinion that Alice, if permitted to be taken home by her father, will become heir to $80,000 or an $100,000. But does the father, who has the disposal of all this wealth, come into court and propose to make any irrevocable provision for her? Does he offer any solid consideration? No. He presents the mere coarse outlines of a picture of wealth, just sufficient to enable his counsel to suggest *expectancies,* and nothing more. But what are these expectancies but a mere *ignis fatuus* to delude the mind of the court? They are necessarily subject, not only to the caprices of this father's nature, but to those vicissitudes usually attendant upon suddenly acquired fortunes. Is a court of conscience to sacrifice the higher welfare of this child upon such considerations, and especially will it make the strain of absolutely abdicating its functions in order to do so? Justice forbids it, and the law fully accords with that decision.

The order appealed from will be reversed and the petition dismissed.

*Petition dismissed.*

Mr. CHIEF JUSTICE BREESE, dissenting :*

The decree in this proceeding for a divorce, instituted by the appellant against appellee, committed the custody of the child, the subject of this controversy, to appellant, until the further order of the court.

This decree was very proper and just, as the child was then a mere infant, incapable of taking care of herself. The rule of the common law, that the father has the paramount right to the custody of his children, was properly modified by the circumstances. Courts of chancery in this country and in England have often so ruled. The order was not final, but temporary only, and subject to future modification.

---

*This case properly belongs to the January Term, 1874, at which time Mr. Justice BREESE was Chief Justice.

As I do not concur in the opinion expressed by a majority of the court, I avail of the scant opportunity afforded me to present, briefly, my views of the case. It need not be said that this is, by no means, an unusual proceeding, very much resting in the discretion of the court, under the circumstances, the dominant question being, what is for the good of the child.

In the section from 2 Bishop on Marriage and Divorce, quoted in part in the opinion, it is said the courts have not laid down exact rules to guide their discretion concerning which of the parties, on a divorce, shall be intrusted with the custody of the children; probably the subject admits not of such rules. The leading doctrine is, to consult the good of the children rather than the gratification of the parents. Therefore, an agreement on this subject between the parents before the decree of divorce is rendered, can have no controlling influence, for they are not the persons whose interests are primarily to be consulted. Sec. 532. Then follows the quotation in the opinion.

There is nothing in this record to show what the conduct of either party was while the marriage relation existed. The only charge is, appellee abandoned his wife without reasonable cause. There is nothing going to show it was a flagrant desertion, but to the world it may have had the appearance of having been causeless. When the divorce suit was decided, the question for the court was, under the statute, which parent should have the custody of the child, and was properly lodged in the discretion of the court trying the cause. It was discreet and proper the care of the child, being then about two years of age, should be temporarily committed to the mother.

Years roll round, and the father petitions the same court to recognize his rights, and to act upon the power reserved in the decree to modify the order, and grant the custody of the child to him. In this application, as in the divorce suit, the question is the same, and in disposing of it much is left to

the discretion of the circuit judge. He had the parties before him ; he was, so to speak, more of the vicinage than this court, and had a better opportunity of knowing the parties and observing their demeanor and appearance to aid his judgment. It may be, the appearance of appellant and her present husband was not prepossessing or calculated to inspire confidence in the judge, that, though she might be a worthy woman, she was not a fit person to take charge of a girl fourteen years of age and impart to her a good education, fitting her for the active duties of life. I fail to find anything in the record showing she is such a person, though she may be a good mother and wife. There is no proof the girl had received three months' schooling, and she has reached an age when the foundation should be securely laid. I can not see the circuit judge has abused his discretion, and this court has not, heretofore, reversed a decree in such cases unless it was apparent there had been an abuse of discretion.

That it is a matter of sound legal discretion with the court trying the cause, is affirmed in many cases. Among them are, *Commonwealth* v. *Addicks and wife*, 5 Binney (Penn.) 520 ; *State* v. *Smith*, 6 Greenlf. (Maine) 462—the welfare of the child being the leading consideration.

The only question, in my judgment, presented to the circuit judge was, what, under the evidence in the cause, is best for the child—to remain in her step-father's family with a large number of children, not one member of the family bearing her name, of different lineage, of moderate resources, her education neglected, and whose outlook bounded by a very narrow circle, or permit her father to take her to his home in the neighboring State of Iowa, where, in his house, she would have no rival, a kind and educated woman to care for her, and a father to watch over her, he, himself, possessed of abundant means and of the highest personal character, and with no other child to divide his affections. These were the questions for the judge, and I think he decided them correctly.

It seems appellee, when he left appellant, made Iowa his home, and some years after, when he was free so to do, married a very reputable and educated woman, of whom it is no shame to say she can master the keys of the piano and the stops of the organ—accomplishments, so considered, which many an indulgent father has impoverished himself to bestow upon a favorite daughter.

It should not be urged, as it seems to be, as an objection to this lady, that she can inspire "a concord of sweet sounds," provided she keeps her house in good order and everything about it clean and neat, as it is proved she does. These should not detract from her merits. All the witnesses speak very favorably of her, and there is not the shadow of a doubt that she would take good care of her husband's child, having none of her own. She seems to possess all the attributes of a good wife, and no blemish should rest upon her by reason of her capacity to master musical instruments found in almost every household.

As to the father, thirteen witnesses who have known him, the most of them more than ten years, give him the very highest character as a man and as a citizen, and his good qualities are beyond all question. There is nothing in the record to show that he amassed his wealth in "the civil war," for that event is not even alluded to in the record, but the inference is irresistible he made it by his industry and sagacity as a farmer, owning the best farm in the county of his residence, raising fine cattle, and dealing successfully in such stock. That he builds churches and school houses, pays his debts and stands up to his contracts, might, without violence, be attributed to the possession by him of many of the good qualities that go to make up a good man and a good citizen. That he will be a kind father, is inferrible from the whole record. The small pittance Alice has, is the gift of her father when the divorce was decreed. He paid her guardian, so soon as it was pronounced, two thousand dollars, out of which her grandfather has received one hundred dollars per annum for

her support for near nine years, when it is said by appellant that, on her marriage with Hewitt, he agreed to take Alice and support her as one of the family.    He has not done so; at least up to the death of her grandparents, by whom she was reared, he has not.    The presumption is a fair one, that what little she has will all be dissipated before she reaches her majority; and when she becomes a burden, her step-father may compel her to seek another home, for he is under no legal obligation to provide for her.    *Bond* v. *Lockwood*, 33 Ill. 215.

All the witnesses concur that appellee is a good man, and his wife a proper person to take charge of his child.    He has a large real and personal estate, possesses great energy and integrity of character, has the confidence of his fellow-citizens in an eminent degree, is exemplary in all the walks of life, and with resources at command, in a judicious application of which lies much of human happiness.    There is a church which he contributed largely to build on the farm, and a school house also, and near by another seat of learning, and the society in which her father and his wife move is of the most unexceptionable character.    He desires the society of his only child, and to bestow upon her an education which shall fit her for that society into which he will introduce her.

It is said, Alice has no affection for her father.    Under the pupilage of her grandfather and her mother she has been taught to consider her father as a stranger, and to shun him as a bad man.    They have striven to alienate the affections of the child from the father.    The grandfather was insane upon this subject, and the whole course of the mother compels the inference that she is actuated by other motives than pure maternal affection.    She did not rear Alice.    At a critical period of her life she was under the care of doting old grandparents, by whom she was taught to detest her father, and to believe he would, some day, seize her and carry her off to Iowa.    This, I understand, is the excuse for failing to send her to a neighboring school.    Whilst with her grandparents

27—76TH ILL.

she saw nothing of the world save as it was exhibited to her within the circumscribed limits of her grandfather's and step-father's humble homes, where her education has been neglected and nine hundred dollars of her small pittance appropriated to her support, nothwithstanding the alleged promise of her step-father to take her as one of his own family. Alice is now fast approaching her majority. She is at an age demanding, most imperiously, a father's care. The question is fairly presented, what is best for the interests of this child, present and prospective, a residence with her father, to be educated by him, and under his control, and be made the heiress of his large estate, or, nominally under the control of her mother, but really under the control of her step-father, destitute of natural affection for her, and whatever element of that nature may be in his composition, divided between the children of his first wife, and those, four in number, by appellant, with a scanty income?

Experience and observation alike teach us there is not and can not be, in the very nature of the relation, entire harmony in a family thus composed.

Who shall have the rearing and education of this child now approaching womanhood? Who, in view of the present and the future—for it is to these we must look—should have the care, custody and control? A misstep now may blast bright hopes forever.

It is, I think, absurd to say, an uneducated child of immature years should decide this question. It can not safely be assumed she has sufficient judgment and discretion to decide for herself. The court must look from a higher stand-point and take a comprehensive view of the whole ground, and in doing so, I am at a loss to understand how the claim of the father can be so summarily disposed of as it has been.

It is said, it would be cruel to separate this child from her mother. How inevitable is the separation, in some form, of parent and child! The mother's desires in this respect can not control. What is best for the child, under the proofs, is the

dominant question, and I do not think a chancellor should hesitate a moment in decreeing as was decreed by the circuit court.

It is made a prominent point in the opinion, that the father intends to take the child to his home in Iowa, and that is deemed an insuperable objection to his petition. Some English cases are referred to in support of this ground, which have no application to this case.

The case of *Dawson* v. *Jay*, 3 DeGex, McNaughton & Gordon, 764, was, where an American maternal aunt, who had been appointed guardian by an American court, sought to take the child, a British subject, from England, out of the control of her paternal aunt, and remove her to the United States, and place her under the control of her maternal aunt there residing. The court would not allow this, as it was against the policy of that country to give any aid to the expatriation of its subjects.

Lord COTTENHAM, in *Campbell* v. *Mackay*, 2 Mylne & Craig, 31, expressed himself strongly on the injurious effects of a permanent residence of English minors abroad, and would not allow an infant ward of the court to be removed out of the jurisdiction of the court, except in a case of imperative necessity.

Chancellor KENT says, a court of chancery will not remit an infant, too young to choose for itself, and being a natural-born citizen, to be taken from a mother without her consent, to be delivered to an alien father to be carried abroad out of the country. 2 Com. 5 Ed. 210, note d.

It was held by the Supreme Court of New York, in *Mercein* v. *The People*, 25 Wend. 64, as the father had a better title to the custody of his minor children, in the absence of any positive disqualification on his part for the discharge of his parental duties, his alienism would not be a disqualification, and his right would be recognized.

It has been held, a court of chancery may make an order to restrain any of its wards from being taken out of its

jurisdiction, if the court shall think it would not be safe to trust the ward beyond its jurisdiction. The court will always act for the benefit of the infant. This is the paramount consideration.

As was said by Lord MANSFIELD, in *Rex* v. *Delaval*, 3 Burrow, 1434, the court must judge upon the circumstances of the particular case, and give their directions accordingly. There is no rule of the British chancery, or of the law courts, which prohibits a guardian by nature from taking his infant children when he pleases, nor does such a rule prevail in any country.

*Miner* v. *Miner*, 11 Ill. 43, is cited and relied on to sustain the proposition that, in no case, will a court of chancery permit a parent to take his child, who may be a ward in chancery, out of the jurisdiction of the court. The reason given for the ground assumed by the court, does not exist in this case. The court say, while the custody of the child is given to the mother, the father must not be wholly deprived of its society, but must be allowed access to it on all reasonable occasions. In that case, decided in 1849, it was the intention of the mother to take the child to her father, in the State of New York, distant a thousand miles from the court, and no facilities for intercourse, there not being any railroad communication with the West. The father was virtually denied access to his child should the intention be carried out. This was a right of which he should not be deprived. It was on this ground, the court said, a removal from the State could not be permitted. Nothing is said or intimated that, by so doing, the court would "abdicate its functions," but it is placed on the ground the father would be deprived of free access to his child.

I do not see why Iowa should be called "a foreign State," in the sense of the English cases. It technically may be so, but it is contiguous to this State and of hourly access by railroads, affording to the mother such opportunities of seeing

her child as her new and enlarged and paramount duties to her husband and his children will permit.

In *Cummins* v. *Cummins*, 29 Ill. 452, it appeared the father, residing in this State, by his last will and testament, appointed his brother, permanently residing in Indiana, the guardian of his infant child. This court allowed such guardian his expenses incurred in taking his ward to Indiana, there to be reared. Here was a tacit admission of the right of the guardian. If a testamentary guardian can do this, I can not see why the guardian by nature and for nurture should be prohibited from so doing.

To render appellee still responsible to the court, he has executed a bond with security, in a heavy penalty, to produce the child whenever demanded by the court, and to obey all orders of the court in regard to her—which bond, if not 'sufficient, can be increased by the order of this court. Should there be misconduct by the father towards the child, should he neglect her education or condemn her to servile employment, or permit his wife to tyrannize over her or misuse her, he is amenable, through this bond, to the court, and can not escape its judgment. It is said the laws and institutions of this State are the child's birthright, and that her allegiance is due to this State. This idea has proved fatal to the prosperity of our southern sister States, and has deluged the land with blood, and piled up hecatombs of victims. It was supposed the blood poured out, and the thousand millions expended on this idea, had expunged it, for the present at least, from all our legal and political codes, as having no foundation. There is nothing in the institutions or laws of Iowa especially differing from our own, and in both States a female is of age at eighteen. We ought not to be considered foreign States, in the sense in which that term is used by the English judges and text writers. We are sister States, in close and friendly communion. The doctrine of the English chancery springs, in no small degree, from motives of public policy. It is well known the young heirs to large possessions

and princely incomes were accustomed to be taken by their guardians to the continent, to France especially, there to indulge in all the extravagances of that country, expending yearly large sums of money, and imbibing ideas and forming habits unfitting them for their home duties.   The courts were unwilling to lend their aid to such an object, but even then, in a case of necessity, they would grant the order.   *Campbell* v. *Mackay, supra.*   The rulings of the English chancery on this point have but little application to this case, our State being in close connection with Iowa, whose policies, institutions and pursuits are homogeneous with our own.

Alice owes no allegiance to this State, nor would she owe any to the State of Iowa.   Allegiance is incompatible with the right of expatriation, a right of which no citizen can be deprived.   Whilst residing in a State, all are bound to obey the behests of its constitution, and conform to the requirements of its laws, and this is the extent of the political obligation.

It is said, the child has an aversion to her father.   Who has inspired and encouraged this sentiment in her bosom? She is young, credulous and ignorant—the spoiled child of a foolish old grandfather.   It is apparent no act of the father toward her has inspired it.   Before he ever saw her he settled two thousand dollars upon her, for it is manifest the decree of the court was, in this respect, a matter of arrangement, and he desires now to lavish upon her, in the most profuse prodigality, all a father's love, to pour out upon her not only that treasure, but make her the heir to his vast possessions. Were she not under the influence of her mother, aggravated by the teachings of her grandfather, and had a competent judgment, can it be doubted how she would decide?   No argument should be urged against appellee, drawn from the fact, whilst she was unborn, he, without any explained cause, separated himself forever from her mother, and thus became a stranger to his child.   It may have been the most meritorious act he could have performed.   It is not shown or

pretended, he, at any time, treated the mother with the slightest unkindness, that he ever spoke to her an angry word, that he has violated any of the commandments or strayed from the path of sobriety and decency, or that he has wanted in due respect to her, other than his voluntary separation ; and who will tell the cause for that separation ? He has lisped no word of blame or censure upon the mother of his child, proclaimed to none his suspicions, pointing not to her as the one "who wing'd the shaft that quiver'd in his heart," but, confining his secret to his own bosom, having no tongue to express his own feelings, he has proceeded calmly and resolutely on his way, built up a high and enviable reputation, gained the confidence and esteem of all who know him, amassed large wealth, and now comes, with no charges against any one, with no recriminations, and prays the court he may be permitted to lavish his parental love and his wealth upon this his only child, and become, in act and deed, her father and her friend. If he has wronged the mother—and who shall say ?—he earnestly desires to make full reparation through the offspring, and brings with him a precious offering.

The majority of the court are of opinion, the best interests of the child demand she should remain where she is, and this is the mother's wish. Is there no selfishness in this ? Can the mother really love the child whom she forbids the acceptance of such an offering ? Should she not deem herself fortunate in being the instrument in such a cause to bring father and child together, loving and to love each other ? Would not the act be in full accord with christian precepts, and greatly redound to the future happiness of all ? Appellant has, at no time, accused appellee of any other wrong than abandonment—a fine theme for rhetoric—but he did not abandon her to want; and if it was wrong—and who shall say ?—he now desires to right the wrong, by taking to his heart and home a child for whom he has the strongest parental affection.

That appellant has capacity to teach this child to cook, to wash, to scrub the floor, and nurse her younger half-brothers and sisters, not one bearing her name, may be true; but are these the height of woman's aspiration? She may manage her children and step-children, and bring them up as Alice has been: ignorant and uneducated; but does that prove her family is the best place for this child? The very fact that different sets of children compose the family, is a strong fact against her being compelled to be a member of it, even if it be her choice. She has not sense or discretion enough to know any better. In view of all the circumstances, may it not be asked if some unworthy sentiment does not prompt this unreasonable opposition of appellant? Is she unwilling her daughter shall move upon a plane more elevated than she herself occupies, or hold a higher social position?

But it is not pecuniary considerations alone which influence my judgment. There are others, more weighty. Placed under her father's care and protection, at her age, there will be bestowed upon her a finished education, in which "playing the piano and organ" will doubtless be included, and be surrounded by all the good influences which aid so much in the formation of the female character, fitting her for the sphere in which she will move, and of which, under his auspices, she may become a distinguished ornament.

No one has breathed a breath against appellee or against his present wife. They are both shown to be eminently qualified to discharge the duty the father beseeches the court to impose upon them, and as security, if such were necessary beyond the love of a father, that he will not abuse the trust, a bond in a heavy penalty has been executed, which, if not deemed sufficient, can be increased by this court.

In looking over the record, I do not think any prejudice should be excited against appellee, because of the efforts he made in the company of her guardian, and with the consent of the mother, to see the child, when she was with her grandparents. He only desired to see her and talk with her, (she

having before that time said to him, she would go to him when she became of age,) to convince her that the time had come when she should be educated. He protests in his examination that he never thought of using force to take her away, but to take her only with her free consent to go. Force was not dreamed of, and none was applied. The insane grandfather was much excited, and prevented appellee from exercising a right fully guaranteed to him, the divorce notwithstanding. *Miner* v. *Miner, supra.*

The doting old grandfather was apprehensive he was to be robbed of his child, and opposed every effort made by the father to see his child. During the years she was most impressible, she had been under the unfortunate influence of this old man, and when asked in court, her mother, her step-father and appellee present, whom she had been taught to dread, what other reply is it to be supposed she would make than the one she did make : that she did not wish to go to her father—that he was a stranger to her. She had just heard her mother testify she had not seen or heard from him since the separation. Well might she say he was a stranger, though undeniably he was her father, and sought to be her protector and friend, lavishing upon her one of the dearest of all gifts: a father's love.

The facts do not show he is a rude and an unfeeling man. The only charge against him is, that he separated from appellant without assigning any cause, and was therefore subject to the provisions of our law of divorce, of which appellant availed so soon as the two years elapsed. Who can tell how much anguish he may have suffered when impelled to leave the mother ? Who knows the cause ? Who will ever know? He does not recriminate, if he has reason. Do we not all remember the history of one of the greatest and best men this country has ever produced, who, when Governor of a great and flourishing State of this Union, just united in marriage to one of her fairest daughters, left his home, his honors, his office and his friends, and sought refuge in the wilderness of

the South-west, leaving the world to wonder? He never disclosed the cause—the secret died with him. Is his reputation less dear, less highly appreciated on this account? Was the cause known, his abandonment might be regarded as the noblest act of his life.

Appellee has shown he has a feeling heart, for when the divorce suit was pending, he consented to a decree which gave appellant one thousand dollars in cash, and to the child two thousand dollars, and he not then rich, which, with the interest thereon, is all the means she has, as I understand the case. Out of this, or the interest on it, her grandfather received for her maintenance one hundred dollars a year, notwithstanding the alleged promise of the step-father to take her into his family as one of them.

The chief matter to be regarded by the court, all the authorities say, is the good of the child. 2 Bish. on Mar. and Div. 633. The books are full of this doctrine. How is it possible for a girl of the age of Alice, reared as she has been, to know what is most for her good? She decides without judgment, and has no capacity to consider the effect of her decision. It is a question in which her present and future welfare is deeply involved, and to say that an ignorant girl of fourteen ought to decide it for herself, is saying too much.

Here is presented a case, where the father, whose right at common law overrides that of the mother, a man of most unquestionable morals and conduct, of high standing in society, of great wealth, achieved, not in "the civil war" by thievery and fat contracts, but by his own talents and industry, with no child but this, entreating the court to be permitted to have her in his custody and control, to educate her, to introduce her into that society he will fit her to adorn, with the certain prospect, if she is filial and dutiful, of making her the sole heiress of his large possessions. In opposition, we find the mother again married, to a widower with three children by a former marriage, with four more by appellant, and the prospect of an increase, possessed altogether of a bare

competence, and the step-father under no legal obligation to give her house room, to educate or to provide for her, whose education has been sadly neglected, and whose mother's sole ambition seems to be to make this child a convenient household drudge. Looking upon this picture, then upon that, should a court hesitate to say that it will be for the good of this child she should be placed with her father? If the mother has a natural right to the custody, it has been held by respectable courts that it is lost and disappears when she has, by a second marriage, surrendered that legal discretion which is necessary to render the parental control of any benefit to the child. *The State* v. *Scott*, 10 Foster (N. H.) 274; *Worcester* v. *Marchant*, 14 Pick. 510.

In the case of this child, parental control is lost in the superior authority of appellant's husband, who is the head of the family, and who may subject her to all the indignities a rude step-father is so potent to inflict.

In the exercise of a sound legal discretion, the circuit judge, knowing the parties, having them and witnesses before him, modified the original order, and committed the child to the care of her natural guardian, one in every way well qualified for the trust, and I agree with him, believing, from all that is shown in this record, that appellee is fully competent and willing to develop the virtues and promote the happiness of his restored child, relying for those purposes more upon the efficiency of parental love than upon the power of parental authority.

It seems to be objected, that the father did not come into court and make an irrevocable provision for the child. Should this be required? Her present guardian, Mr. Prunty, testifies she will inherit from her father eighty or one hundred thousand dollars. This is to be understood, if she survives him and is filial and dutiful. Is this expectancy unworthy the consideration of a chancellor? All courts regard this as of value, and so should we. This expectancy might soon become reality, as the father is advanced in years.

Stress is laid on the relation in which this child is supposed to stand as a ward in chancery, and it is said to permit her to be carried beyond the jurisdiction of the court would be an abdication of the functions of the court. I have read of such a relation, but in all my experience I have never known it to be practically enforced in this country. Nothing of this kind was intimated in *Miner* v. *Miner, supra.*

But the case is closed. By the edict of this court, the doom of this child is forever sealed. The mother and the child may live to regret this blighting of a prospect so replete with all the elements conducive to human happiness, and which dawns upon very few. Both may weep bitter tears of regret, the more bitter and the more agonizing because they will be unheeded and unavailing.

My judgment is, the decree of the circuit court committing this child to the care of her father was correct, and should be affirmed.

Mr. JUSTICE SHELDON: I concur with Mr. CHIEF JUSTICE BREESE.