## Thomas Y. Scott v. Litta Cohn.

### Gen. No. 13,295.

1. CUSTODY OF CHILD—*prime consideration in awarding.* After divorce the prime consideration which determines to whom the custody of the issue of the marriage should be awarded, is the good of that issue.

2. CHANCELLOR—*when may not decide question of custody of child upon independent investigation.* A chancellor cannot determine the question as to the custody of a child upon an independent investigation made by him, through agreement of counsel for the parties, especially where the investigation was not personally made.

Divorce. Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in this court at the October term, 1906. Reversed. Opinion filed May 31, 1907.

**Statement by the Court.** Appellee and appellant, prior to February 10, 1902, were husband and wife. At that date the Circuit Court rendered a decree, at the suit of appellee, divorcing her from appellant. They had one child, the sole issue of their marriage, Lake Y. Scott, who was six years of age February 27, 1906. The decree of divorce contains the following: "It is further ordered by the court that the sole care, custody and control of the child of the parties hereto, Lake Y. Scott, be, and the same is hereby given to the said defendant, Thomas Y. Scott, until the further order of the court." It appears from the evidence that, by arrangement between the parties, the defendant was to have the custody of the child, and for that and other considerations, he did not defend

the suit. At the time the decree was rendered, appellant was living in Springfield, in this state, and appellee was in the city of Chicago.

November 29, 1905, appellee filed a petition in the divorce cause, in the Circuit Court, in which, after setting up the prior proceedings, as above stated, it is averred, in substance, that appellee, since the divorce, was married to Samuel A. Cohn, who is engaged in the restaurant business, and that she and Cohn were residing at 3356 Indiana avenue, in the city of Chicago, and that since the entry of the decree appellant has married, and the child has resided with him in Springfield, in this state; that at the time of entry of the decree appellee was not able to care for herself and the child, but is now able to care for him, to which her husband has consented. It is also averred that she has been permitted to see the child but seldom, and on such occasions has had to go to Springfield, Illinois, to see him, and that appellant has refused to permit the child to visit her, and the child is taught to regard another, not of kin to him, as his mother. A modification of the decree is prayed, allowing the appellee the custody and care of the child for a part of each year. Issues were joined by answer and replication; the cause was heard on evidence produced in open court, and, July 17, 1906, the court, after finding in favor of appellee, decreed as follows:

"It is therefore ordered, adjudged and decreed that in said decree entered in this cause on the 15th day of December, A. D. 1901, the following words, 'It is further ordered by the court that the sole care, custody and control of the child of the parties hereto, to wit, Lake Y. Scott, be and the same is given to the defendant, Thomas Y. Scott, until the further order of this court,' be struck out, and henceforth are of no further force and effect.

"And it is now here further ordered and decreed by the court, that the care, custody and control of the said Lake Y. Scott, a minor child of the said Litta Scott, now Litta Cohn, and the said defendant, Thomas Y. Scott, be and the same is now hereby, on the 17th

Scott v. Cohn.

day of July, A. D. 1906, given to the said Litta Cohn on and from the date of the entry of this decretal order, for, during and until the first day of September, A. D. 1906.

"And it is also ordered and decreed that said defendant shall, on the first day of July of each year hereafter, permit, without interference or hindrance, said Litta Cohn to take care and custody of said child and to bring him to her house in the city of Chicago, and there remain until the last day of August of each year, the said Litta Cohn being further given until the time last aforesaid, of each year, the care and custody of said child, Lake Y. Scott.

"It is further ordered that both or either of said parties shall be at liberty from time to time to invoke the aid of this court to enforce this part of this decree and order, or to alter, change or amend the same."

PEASE, SMIETANKA & POLKEY, for appellant.

EDWARD H. MORRIS, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

It is assigned as error that the decree is contrary to the evidence, and that the court erred in awarding the custody of the child to appellee during the months of July and August of each year.  The appellant is a druggist, and before and since the rendition of the decree of divorce has resided in Springfield, in this state, and about November 1, 1904, he married again, is keeping house, and receives a salary of $80 per month from a Springfield firm engaged in the drug business.  A short time before the decree of divorce was rendered, while appellee was living in Chicago with her married sister, appellant, in response to letters received from appellee's sister and brother-in-law, came to Chicago and got the child, with appellee's consent, and took him to his, appellant's, mother, Mrs. Martha Scott, who owns and resides on a farm about two

and one-half miles from Berlin, Illinois, which latter place is in Sangamon county, and about seventeen miles from Springfield. Appellant's sister and brother-in-law, Mr. and Mrs. Robertson, and their children, also live on the farm with Mrs. Martha Scott. The child, Lake Y. Scott, has lived with his grandmother ever since he was taken to her place before the divorce. Appellant pays ten dollars per month for his board and clothes him. The uncontroverted evidence is that the child is well cared for and is strong, contented and happy. Mrs. Martha Scott has an excellent reputation and is respectably connected. The following witnesses testify to appellant's reputation:

H. Clay Wilson: Have known Scott eight or ten years. He stands fairly well as a citizen in the community, is amply able to care for and educate his child; has never been idle since I have known him, always stuck to his business.

G. W. Hulett: Have known Scott seven years; he worked for me four and one-half years. He is a respectable citizen and amply able to take care of and educate his child.

Six other witnesses testified to the same effect. This evidence is not controverted. Appellee testified that she had nothing to say against the character of appellant or of those caring for the child. That the child is well and amply provided for, and is strong, healthy and happy, and is surrounded by a good moral atmosphere, is abundantly proven, and there is not a scintilla of evidence to the contrary.

Appellee testified that since the decree of divorce was rendered, she visited the child at her own expense, going at first about every month; that the child was living with his grandmother, about seventeen miles from Springfield, and when she saw him he did not recognize her as his mother; that he called his grandmother mama, and that she has asked to have the child visit her in Chicago, which has been refused.

Appellant testified that he instructed his people that he wished them to treat appellee properly when

Scott v. Cohn.

she visited the child; that he thought this no more than right as she was the child's mother, and that there was no restriction placed on her as to visiting the child. Mrs. Robertson, appellant's sister, who, with her husband and children, lives with Mrs. Martha Scott, testified: "I have known Mrs. Litta Scott about eight years. She has been out to see the child. She generally came about one o'clock and left at four. The last time she was there, she stayed fifteen minutes; the train was late. She would stay several days in Springfield. I said to her, 'I should think you would stay longer with your child.' She said, 'I have friends in Springfield, and I cannot stay longer with him.' We always treated her kindly and made her welcome. She seemed glad to see the child, but there was no emotion when she would leave. She was out for the last time in August, 1904. Sometimes she bought him toys and two or three times she bought him candy. She has never written but once to my mother about the child. She has never written to him. The child has been with us four years, the first of last month."

We think it unnecessary and inexpedient to refer specially to the evidence in respect to appellee's manner of life and conduct since the divorce and since she became acquainted with him whom she now calls her husband. Suffice it to say that there is not a particle of evidence in the record tending in the least to prove that she is a fit person to have the care and custody of the child for two months in each year or for any time. The evidence tends to prove the contrary. Counsel for appellee does not, in his argument, rely on any evidence in the record, aside from financial ability, as tending to show that appellee is a fit person to have the custody of the child, or that it would be to his interest, in any way, to be transferred from the custody of appellant to that of appellee for any time. Counsel for appellee contends that counsel for the parties, respectively, agreed that the chancellor might investigate for himself and decide accordingly,

and that the court so did. In support of this conten-
tion the following is relied on:

February 17, 1906, after the evidence was all in and
argument heard, the following occurred:

"The Court: It has gotten up to this point, whether
the extent to which Mr. Cohn has been shown by the
evidence is sufficient evidence to say that his home
there would be an improper place for this child to be
because he has been shown to be a gambler. That is
the way it seems to me, and I was going to make this
suggestion. I will investigate this further; if it is
true, and so remains, then the child ought not to go
there.

Mr. Pease: If what, your Honor?

The Court: If what I just stated is true then the
child ought not to go there, but if further examination
shows, nevertheless, that the surroundings and the
home life would be the proper place for a young boy
of that age to be for a reasonable time during vaca-
tion, why, I think he ought to go.

Mr. Morris: Does your Honor say you want fur-
ther evidence?

The Court: I don't know whether I will ask you
to get it or not; I may be able to find out myself.

Mr. Morris: That is right, your Honor, you can
make any investigation, any suggestion that we can
make; we will be glad to assist the court.

The Court: The court can make the investigation
in its own way in reference to Mr. and Mrs. Cohn's
home life.

Mr. Morris: Nothing pleases me better if your
Honor comes to that conclusion.

Mr. Pease: That is perfectly satisfactory to me.

The Court: I don't know when I ever decided a
case with so much satisfaction.

Mr. Morris: Investigation as to the condition of
home life.

The Court: I think that ought to be done.

Mr. Pease: I think your Honor is putting the mat-

ter not only on a sound legal principle, but sound common sense.

The Court:   In the meantime Mr. Scott can take the boy to his home and put him in school.   What school are you going to send him to?''

July 17, 1906, the following occurred:

''Mr. Pease:   I don't know what investigation your Honor has made in the matter.   As I stated the other day, I presume the amount of work your Honor has done the last two months, you have not much time to investigate this matter.

The Court:   I have my own way of doing it.   I have not made a personal investigation.

Mr. Pease:   This all happened after the hearing of March 1st.   Of course, I knew that Judge Walker was too busy to go out and investigate this household, although the police department of this city can furnish you all the information you want with regard to this man here.

Mr. Morris:   You are asking the court to try a matter between the landlord and tenant.

Mr. Pease:   I simply state to the court the head of the gambling detail can furnish the necessary information, or the clerk at the Harrison street station.

The Court:   I have probably as good means of information as any man in Chicago, I think.   I was corporation counsel of Chicago for four years, and I was alderman for two terms before that, and if anybody can show me anything about the police department I would like to find it out.   I have caused to be made a very thorough investigation as to Mr. Cohn, and I am very well satisfied that he is all right.   I know all about him.   Whatever was brought out in this hearing is no surprise to me.

She seems to show it now, whether she showed it before or not; she is showing it now.   All that remains for me to do is to find out whether the surroundings of her home are a proper place, and from what I hear of Cohn, I am very well satisfied that that child will not be injured in any way.

Mr. Pease:  What have you heard of her?
The Court:  What have I heard of her?
Mr. Pease:  Yes.
The Court:  Since then, nothing at all.''

It is apparent that the chancellor made no personal investigation whatever. He expressly so says, and we are asked to decide on what the court may have heard from others, not under oath, whose statements do not appear in the record, and this relating only to Mr. Cohn, of whom the court says, ''I am very well satisfied that he is all right.'' Asked what he had heard of appellee, since the evidence closed, the chancellor said, ''Since then, nothing at all.''

Counsel for appellant say that the judge determined the issues, not only by the evidence heard in open court, but by the investigation which he caused to be made. We can only determine the issues by the evidence produced in open court. This is not like a condemnation case, in which, by the Eminent Domain Act, the jury, on request of either party, may view the premises to be condemned, and their view is evidence. If the chancellor might decide partly on an investigation made out of court, such as it is claimed was made in this cause, then he might decide wholly on such investigation, the only difference between the two cases being not in kind, but in degree. No agreement between counsel, such as is claimed to have been made, can bind the minor, whose interest is the main question to be considered.

In 2 Bishop on Marriage and Divorce, under the sub-title, ''The custody independently of Divorce and Divorce proceedings,'' parag. 1161, p. 453, it is said: ''The good of the child is universally deemed to be the leading consideration, to which the claims of all other persons must yield on sufficient pressure;'' and the same author, in parag. 1193, p. 464, under the next sub-title, ''The custody on and after the Divorce,'' says: ''It is both law and common sense, that the superior right goes with the superior interest. So

that now, more emphatically than under the circumstances of the other sub-title, the good of the child is the controlling force in directing its custody.''

In Hewitt v. Long, 76 Ill. 399, 408, the court say: ''In disposing of the custody of children, the primary object should be the good of children,'' and in Umlauf v. Umlauf, 128 Ill. 378, 380, this language occurs: ''The controlling consideration, when both the husband and the wife are equally fit to have the care of the children, is the welfare of the children, and not the gratification of either parent.''

This is not a case in which the parents are equally fit to have the care of the child; on the contrary, the great weight of the evidence manifestly is, that the appellant is, both by character and financial ability, fit to have the custody and care of the child, while the evidence as to appellee's personal fitness to have such custody is as heretofore stated.

We regard the decree as being manifestly against the clear weight of the evidence.

The evidence clearly shows that it is for the interest of the child to remain in the custody and care of appellant. No obstacle appears to appellee visiting the child as often as she may desire so to do.

The decree of July 17, 1906, appealed from, will be reversed.

*Reversed.*